Good morning, Your Honors. My name is Frank Reagan. I represent Douglas Dustin. The Court knows from the briefs that there are a number of issues presented here today. I'd like to begin with the first issue, and that revolves around the Estelle v. Smith question. Essentially, what has happened here is that Douglas Dustin was involved in a homicide of his wife. He surrendered with his lawyer to law enforcement. And the lawyer, in his presence and on his behalf, asserted his Fifth and Sixth Amendment rights and got a guarantee from the officers that they wouldn't conduct any examination of him without the attorney being present. Thereafter, Dr. Dustin was – I'm sorry, I refer to him as Dr. Dustin because he was a dentist and practicing at the time – took him to county jail where he was examined by two psychiatrists and a psychologist over the next two days. After he expressed suicidal ideations upon booking. That's correct, Your Honor. Doesn't that change the factual scenario from Estelle v. Smith? We're not talking here about police officers violating their promise and approaching your client at the San Diego County Jail. Now we're talking about jail psychiatrists trying to do mental health evaluation as to whether or not this inmate is likely to do himself in. Which the law compels them to do. Yes. And quite frankly, I don't oppose doctors doing that because they certainly have an obligation to act in conformity with their responsibilities. My problem arises when the statements that Dr. Dustin has made to these doctors is admitted into evidence. But didn't you put the mental state of your client at issue? Yes. But by putting the mental state of the client at issue doesn't waive all Fifth and Sixth Amendment rights. The way I see the case is that the California Court of Appeals, in its decision, concluded that this was not an interrogation for the purpose of eliciting and incriminating information whatsoever. It was the performance by doctors of the medical duties that were thrust upon them as a result of your client suggesting he might kill himself in custody. So why is that contrary to clearly established federal law as stated by the United States Supreme Court? Because Estelle v. Smith holds that when an individual is examined by psychiatrists and testimony is elicited in violation of the Fifth Amendment and Powell v. Texas in violation of the Sixth Amendment, that testimony cannot come into evidence. Your Honor, this wasn't elicited. This wasn't Fifth Amendment testimony at all. It was not for the purpose of getting any information at all about the case. The statements that were acquired by the psychiatrist were not statements to determine if he was a suicide risk. They went into significant detail about the facts and circumstances of the homicide, the facts and circumstances of his behavior and his wife's behavior leading up to the time of the homicide. But counsel, why is that not relevant when a psychiatrist is attempting to do a mental health evaluation on an inmate to determine whether or not he might pose a danger to himself or others while he's confined? Well, I'm not a psychiatrist, and so I really don't know that a complete history might not be relevant to make it. Excuse me for interrupting you, but the Court of Appeals, don't we have to find this to be just off the wall? That's what the Supreme Court has told us recently. I don't know what it is. It's clearly erroneous and irrational, and they say, they talk about this. In Perkins, the Court stressed that Miranda was meant to preserve this during an incommunicado interrogation. No such circumstances were present in this case. Dustin was examined by these doctors because he expressed a desire to kill himself, and they've interviewed him to determine whether it was necessary to protect him from doing so by placing him in the psychiatric security unit. Accordingly, the testimony and all this kind of stuff, there's no evidence, no evidence, that they acted in order to obtain incriminating information or provide such information to law enforcement. So we've got the Court of Appeals saying this wasn't a Fifth Amendment violation. That has to be clearly erroneous, and I don't see how it can be. Once your client says, I'm going to kill myself, or I'm thinking of killing myself. I think the problem lies, Your Honor, not in the acquisition of the interview or the information by the doctors, but the introduction of that into evidence, because here we have a situation where Dr. Dustin willingly submitted himself to an examination by Dr. Braff, the DA's prosecution psychiatrist, in order to allow them evidence to refute the mental health, the insanity defense. Mr. Reagan, if Judge Trott, in reading that portion of the Court of Appeals opinion, if they're correct that the statement was not taken in violation of the Fifth or Sixth Amendment, then how would he have a right to suppress those statements? Well, it's my position. It would be a constitutional violation, doesn't it? And it has to be due process after Chavez v. Martinez. Yeah, Martinez. What we have here is an attorney who asserted both the Fifth and Sixth Amendment rights. And then by the Court of Appeals that there was no violation, that that promise made to him was not breached by law enforcement. Well, it's my position that this Court has an obligation to look at the Supreme Court precedent to determine whether that's properly applied by the California Court of Appeals. And we have. And Judge Trott just reminded me, I got reversed last week in Chavez v. Martinez. And they didn't find a due process, or at least a Fifth Amendment violation there where there was an interrogation by law enforcement. We've also not only read Estelle v. Smith, but Buchanan v. Kentucky. If I may just shift gears then, Your Honor, to the Sixth Amendment aspect of this at the same time. In Buchanan v. Kentucky, Your Honor, it was both sides requested the doctor's exam. And there was information from the exam introduced by the defense. And then a portion of the general conclusions were read by the prosecution. It wasn't the defendant's statements. Yeah, but I think this case is much easier because the doctors didn't do this on behalf of anybody in connection with guilt or innocence. The law requires them to stop this guy, to protect this guy from himself. And the doctors waited in because he was talking about killing himself. If this guy kills himself, there's a gigantic civil lawsuit that hits the municipality like an atomic bomb in about four seconds. And that's what they were dealing with, simply trying to stop the guy from killing himself. That's not interrogation design. It's a secure, incriminating information in connection with the charges that are against him. But it did, in fact, acquire that type of information that was introduced. But there was no Fifth Amendment violation when the stuff was taken. So then when it's used, you have to say, well, then what stops it from being used if there was no Fifth Amendment violation? There was also the Sixth Amendment violation. So is your position now that every time an inmate threatens to kill himself, that the jail psychiatrist have to wait until his lawyer comes to the jail before they can do the emergency evaluation? It's my position that the jail psychiatrist can do the evaluation, can assist the individual. But what statements made by the defendant can't come into evidence at a trial. It's an emergency circumstance where the doctors are. You've got to find a violation first, don't you? It's a violation of the Sixth Amendment. Once he's asserted that Sixth Amendment to conduct any kind of incriminatory examination of him. So the doctors violated the Sixth Amendment when they were trying to figure out whether he was really going to kill himself? Yes, because his attorney asserted on his behalf that he wanted to be present before any interview of his client. His attorney asserted Fifth Amendment privilege. I think he asserted both, Your Honor. The affidavit speaks to both. How does the Sixth Amendment work and what case do you have from the Supreme Court that says this is a Sixth Amendment violation? Well, of course, every case turns on its individual facts. But Kyle versus Texas is the Supreme Court case. But isn't that where the court ordered a psychiatric evaluation? Yes, Your Honor. And that's different. That's an evaluation to determine his competency to stand trial, right? I believe that's correct, Your Honor. Okay. So it seems to me we're dealing with a different factual situation here. This is an emergency psychiatric evaluation because of something your client has done. The problem is there's absolutely no protection for a person in a position such as my defendant's in unless the statements that are elicited by the doctors in an effort to help him and play with the possible lawsuits against the county are not admitted into evidence and don't become something that he can be afraid of. Did the government try to introduce this information in this case in chief? I believe they introduced it in the guilt phase in response to contemplated mental health evidence by the defense. May I get a cup of water real quick? Okay. I'm getting it. Thank you. So I understand the court's position, but I would submit it's clear that there's a Fifth and Sixth Amendment right the defendant has. And the fact that the testimony is elicited under these emergency circumstances, the correct remedy is to allow the doctors to do their work but then not admit it into evidence. But why shouldn't the rule be if there is no constitutional violation for the emergency psychiatric evaluation, why shouldn't the rule be that it is simply the tactical risk later on when the defendant decides to put his mental health, his sanity in issue at trial to require him to weigh in the balance the risk that the statements that were elicited from him for a legitimate reason are now going to come in because he's put his sanity in issue? Because as a matter of public policy, we're going to have many, many, many defendants, some acutely psychotic, as I believe my client was at the time, others in a lesser position that will be examined for suicide purposes or some other mental status situation. And that the district attorney's office will have carte blanche to introduce that into evidence without any Fifth or Sixth Amendment rights. So you're suggesting the state will do this on purpose, that we're going to evaluate all arrestees for homicides and then try and trick them into giving incriminating admissions this way? Well, I don't know that I would take it that far, but I wouldn't take it much, not too far from where you went. It happens. I understand that. Yes, sir. And you're not disputing the fact that he did express on booking that he wanted to kill himself? Well, the psychiatric nurse, who was also his attorney, talked about him being psychotic, overtly psychotic, and there's no evidence that I know of in the record or personally that would indicate he didn't say that. So but I think as a matter of public policy, there's nothing wrong with allowing the doctors to do their work. But I think the problem arises in allowing it into evidence when the district attorney and the state have the opportunity to have the person examined by a psychiatrist or a psychiatrist, if they wish. They sought one, and that Dr. David Braff, and he examined Dr. Dustin. Dr. Dustin was cooperative. The court appointed three other persons, all found Dr. Dustin to be legally insane. They all testified on behalf of the defense. The defense had psychiatrists. At the guilt phase, the only psychiatrist and psychologist that testified for the people were these three individuals that had contact with Dr. Dustin a couple of days after his arrest. Hasn't the Supreme Court, though, broadly suggested that when you put your mental state at issue like this, that there's a waiver? I think there is language in those decisions that suggests that, Your Honor. I don't disagree with that, but I think a close reading of those cases, each one of those cases contains a circumstance such as this is the only way the state could counter the defendant's mental health evidence. In each one of those instances, there's there's some language like that. I've not seen a case, and I don't tend to be an expert in these matters, but I've not seen a case where the Supreme Court has said if you put your mental health at issue, your Fifth and Sixth Amendment rights are waived. I've not seen that. On the contrary, the decisions seem to go the other way from Powell v. Texas and Estelle v. Smith. Thank you. Well, Your Honor, if I may just briefly go on to it. There are some other issues that I think are very important, and I'll be real brief. The competency question. There was no competency hearing held at the time Dr. Dustin waived his right to a jury trial and agreed to submit the matter to the judge on the transcripts of the two prior trials. Yes, sir. As I recall the law on this point, it's whether at the time that the jury trial waiver is made, whether the defendant has exhibited enough irrational conduct, if you will, here the fellow had been in the state hospital, of course, from which we should say that the judge, state judge, should have been alerted to the possible incompetency to stand trial and should have then held a competency hearing. I agree with that. That's generally the law. I agree with that, Your Honor. Here you say, well, the fellow had been in the state hospital and had recently been released, but what was it that would have prompted the ordinary or the good judge to have ordered a competency hearing or to have held, because there's a question whether it was ordered or not, to have held a competency hearing? The good judge sat through a sanity phase trial and knew the thick old background of Dr. Dustin. Is Judge Reeve back? Yes, sir. And he, at the conclusion or when the jury hung, the jury hung twice on sanity, unable to reach a verdict. The second time, Dr. Dustin was sent to Patton State Mental Hospital as incompetent and needing their care. Then at Patton State Hospital, Dr. Hattis wrote a report to the court saying, we've found a medication that's incredibly strong and incredibly toxic, but it helps this man be competent and we're administering it to him and we believe he's going to be competent to stand trial in the months ahead. And that was a detailed letter, a copy of which went to Dr. Reeve, excuse me, to Judge Reeveck. And that was in the file. Then Greg Michel, another doctor, wrote a report to the court about the defendant's competency and what would have to happen for his competency to be maintained. And that was his being housed in a private hospital in San Diego with the Nardil drug, with a very specific diet in order to maintain his sanity, none of which occurred when he came back on October 5th and was put in the county jail. And that was all in the file and all something Judge Reeveck was aware of. And then Dr. Reeveck, excuse me, Dr. Dustin appeared in front of Judge Weber, and the matter is continued to another date in front of Judge Reeveck. And on that there's a notation, continued for 1368 hearing. Now, it's our position that Dr. Dustin was decompensating while in county jail from October 5th on because he wasn't getting his Nardil. He wasn't being treated as the doctors from Patton said he had to be treated in order to maintain competency. What's the evidence that he was falling apart? The evidence that he was falling apart comes from statements from the defendant himself and the notation in the record of the 1368 hearing set by Judge Weber. And there's nothing in the record beyond just a simple notation on a docket sheet in a 1368 hearing. But a 1368 hearing is how you determine competence in the state of California. And Dr. Dustin's statements and that he was decompensating in the jail. We don't have, as the Judge Thompson points out, we don't have a situation where the man is overtly psychotic in front of the trial court. We don't have that. And apparently not in front of his own lawyer either. Well, his own lawyer did not bring it up. That's correct. Yes. So you'd think that the lawyer's reaction is that he's all right. And the lawyer then marches him into the adjudication setting. But the examination at the time that he waives jury trial and he agrees to a trial and he's prior to transcripts is really sort of, it's not very detailed in terms of it says, how do you feel? Are you okay? Questions like that. It doesn't talk about the requirements that Patton State Hospital set forth, whether they're being met, whether he's getting his medication. He's sort of exasperated. The defendant is. I want to get this over with. It's gone on too long. I want to go to Patton. I want to go. I want to get out of here. And Judge Reback immediately, after taking the waiver, sends him back to Patton State Hospital where he is housed and receiving his medication until he comes to San Diego. Let me shift gears on you just a second. One of your complaints is that the trial that was ultimately held was based not on a full and complete transcript. Yes, Your Honor. And what I've been unable to locate in the record so far is a clear delineation of the material that you say should have gone to the trial judge and did not. It appears to me there's a lot of stuff that's just not that relevant. I think for what wasn't in the transcript, that should have been that would have made a difference. Well, yes, Your Honor, I have identified it. Whether it would make a difference, of course, is subjective determination for the prior fact. But what's the key aspect of the of the information that you've identified that you think would have made a difference or should have made a difference or could have made a difference? There's two aspects to it, if I may. The first is this man waived his right to a jury trial on sanity and guilt. And two prior juries had been unable to convict or find him guilty of sanity. We understand that. Okay. And so the judge said, I will do this based upon the transcripts of the prior trials, the evidence from the prior trials. I think that is not that waiver is based upon that agreement. It doesn't make any difference what was missing. If it wasn't all there, it's invalid right on the spot. I think that's correct, Your Honor, but especially when it relates to testimony. And there was testimony missing from Dr. Braff. There was testimony missing from Dr. Archer. There was testimony missing from Pastor Warman. And that's especially important because Pastor Warman was the person providing the psychological guidance and counseling to Dr. Dustin in the three or four months immediately prior to the homicide. And there were tape recordings introduced into evidence at the jury trials. But there were not transcripts made and the judge didn't have the tapes. He only had those portions of the transcript that were present, that were presented to him. And some of those transcripts were never prepared. So those are the things, Your Honor, and I think they're detailed in my brief. And I don't think counsel for the other side has any disagreement that those things are simply not there. So I think there's two aspects to it. One is that Pastor Warman's counseling sessions, the transcript of that, might well have impacted Judge Rivack on the question of sanity. Now, the missing transcript issue, was that a part of your state court case? It was not. I believe it was presented by a writ of habeas corpus to the state courts. It was not in the opinion from the court of appeals. How did the state court handle it in the writ of habeas corpus? It was just a denial. Denial. No opinion. No opinion at all. Right. All right. Thank you, counsel. We'll hear from the other side. Thank you, Your Honor. Appreciate your help. Good morning, Your Honors. California Deputy Attorney General Holly Wilkins on behalf of the respondent. With respect to the issue of the Fifth and Sixth Amendment privileges, in light of the highly deferential standard binding this court, and the comments of Your Honors this morning, I will not address that absent any questions. With respect to the 1368, I would indicate that Judge Weber did not order a 1368 hearing. There was an erroneous entry on a minute order, which was understandable under the circumstances because Dr. Destin was arriving from Patton to her courtroom. Her sole responsibility with respect to Dr. Destin was trailing a trial, and mistakenly it was characterized as 1368. There was no findings, no request for a 1368. There's nothing in the record to suggest such a finding. What was the purpose of the appearance before Judge Weber? It was to trail the upcoming criminal trial. By trail, you mean keep track of it or to set a date for it? To set a date. To set a trial date? Correct. And there had been a restoration of competency only a few weeks earlier. Right. And so if there had been a finding by Judge Weber, there would have been a transcript, there would have been discussion, there would have been observations. So Judge Weber sets the trial date, and it is then assigned over to REVAC for the trial, is that it? That's correct. And there was absolutely no follow-up on this entry. There was nothing preceding the entry. It was simply 1368 written in before the word trial, and clearly, clearly an error. And moreover, Judge REVAC went forward with the criminal proceedings. There was no suspension of criminal proceedings at that point. Did Judge Weber sign the minutes, or is that just the clerk's entry on the minutes? It's merely the clerk's entry. The court instructs the clerk to prepare the minutes, and they're not signed. There were no orders, nothing that you would customarily see with a declaration by a court suspending criminal proceedings. So it's clearly just an error. And as the court observed, there was no indication by counsel that there was any change in circumstances with respect to Dr. Dustin, and there's just no evidence of any decompensation whatsoever. Did the record indicate that he was not getting the Nardil or that he was not getting the diet he should have? No, that was never affirmatively established, and obviously, both Judge Weber and Judge REVAC were, I think, to account for Dr. Dustin being housed at Patton, as was his preference. And we certainly have him being observed by Patton up until his arrival into Judge Weber's courtroom. And there's... Let me put it another way. Was there anything before either Judge Weber or Judge REVAC that Dr. Dustin had not been receiving the medication prescribed to him at Patton, or that he had not been made... that the diet had not been made available? I'm not aware of any evidence presented to the court on that. I know that there was materials about Dr. Dustin's restoration of mental competency and what medication he was on and what was necessary to maintain his restoration, but I'm not aware of any presentation of evidence or representation to the court that there was a problem that needed to be addressed. They were asking for Dr. Dustin to be returned to Patton. He wanted to be housed at Patton, and Judge REVAC accommodated that. Suppose he had been deprived of the Nardil, and suppose that he had not received the diet he should have, and he was just nuttier than a fruitcake, and he would be of no help whatsoever to his client, but he disguises that so that his lawyer doesn't make any mention of it. It's not apparent to the judge. The judge doesn't do anything about it. But in truth and in fact, he really is unable to participate in the trial and to stand trial. What do we do with a situation if that were the case, yet it was not apparent to anybody? Well, if it's not apparent to anybody, I would suggest that you can't establish it. Obviously, you're going to need expert testimony, and retrospective competency determinations are questionable at best. And there's nothing to even establish that he would decompensate over a set period of time without this medication. That's not even in the record. And obviously, Patton felt they had developed therapy, and they wanted that therapy in place. But there's nothing to suggest that if he missed his medication, or that he could even mask that kind of psychosis effectively from his counsel. I mean, that would be highly unusual. Frankly, there's evidence of malingering in this case, and there's nothing where Dr. Destin is trying to convey to the court that he is somehow lacking in competency, or even as counsel suggested on appeal and to this court, that somehow he was entering into a slow plea simply to get back to Patton. That's not even supported by the record. But I have difficulty believing that he could disguise a psychosis from his own attorney, let alone the court. And I don't believe that there's anything in his background where he ever had an incentive not to reveal his symptomology. There's never anything in his history where he's ever attempting to disguise anything. And even if you want to reject the malingering assertion by the prosecution, I don't see any masking of anything by this man from the time of the separation through the time of his ultimately being found guilty. So I find it just completely unsupportable that he was masking any kind of major change in his mental condition. There's nothing to support that. Now, with respect to the missing record, it was my understanding that the only thing that was missing were bench conferences. And to the extent that counsel's indicating that the tape recordings of Pastor Warman's counseling or transcripts thereof were not a part of the record, which I don't believe, but even if that were the case, we need to recall that Judge Rivack presided over the second sanity phase. He heard them. He heard them as the jury did. This comes into us in a little bit of a different vehicle. It's a Strickland claim, too, isn't it? Correct. Counted ineffective for not assembling everything? Correct. And I just... It's got to be prejudice if you have a Strickland claim. And I guess one of your arguments is there is no prejudice because this is the judge that had heard all this stuff. Well, exactly. The bench conferences with respect to the admissibility of the jail psychiatrist are irrelevant when Judge Rivack considers the evidence that was before the jury in the guilt phase. And he was completely familiar as the judge with the second sanity phase. So if there's some sort of import from the drama of these tape recordings of Pastor Warman, he was subject to that with the jury. So even assuming that counsel's correct and there was some sort of testimony missing from the sanity phase, there's no prejudice because Judge Rivack, he certainly undertook to review and said he reviewed the entire sanity phase even though he presided over it. He took weeks reviewing that. And the defense counsel is indicating on the record all the trouble that was gone to to get everything before him. So very commendable. He didn't just say, I presided over your second sanity phase. He reviewed it all. But if there was a tape recording that wasn't played, he heard it initially before the jury. So I would indicate that there's just absolutely no prejudice prong for Strickland with respect to that. I do not, Your Honor, if there are no questions. Mr. Reagan, we'll let you respond to that. Thank you, Your Honor. I'll jump around just a bit. Page 221 of the excerpt of record does provide the order regarding 1368 and it is an order signed by Judge Weber. Just a second. 221? 221 is my pagination. Is that the minute order that we were looking for? Yes, Your Honor. There's Joan Weber's signature at the bottom of this. Yes. Just a second. We don't have a transcript of what was said at that hearing. We just don't have any evidence of that. But the fact that a 1368 competency notation is made in the minute order, I think the court can conclude from that there was a question as to his competency. Well, maybe, maybe not. What about the last point that counsel made? The transcript business comes to us in a Strickland capacity and even if there was something missing, there's no showing at all of any prejudice because, among other things, this is the judge that already heard those tapes. Well, I think it's very different and those of you who have been trial judges will know this better than I, but for a judge to sit as a presiding person over a jury trial and have tape recordings played and be the finder of fact responsible for determining whether something has been established beyond a reasonable doubt or whatever the standard might be. And I think that's the difference. You could simply be a presiding judge in a court and say, play the tape, Mr. D.A. or Mr. Defense lawyer, and it plays and you don't really concentrate on it, which I would suggest to you is more the norm than a conscientious observation of what is supporting the psychiatric evidence. And so that's that's why I think there is significant prejudice. I'm not asking you to write that. When you make those motions, you always bring that to the attention of the court. Read it. Yes, sir. The significance of it. That's right. But I think in this instance, these were months of tapes and select tapes were were used. And so I think that the fact that the court didn't hear them was severely prejudiced. Dr. Dustin, thank you very much. Your Honor, just one last word. The same is true for the purposes of appeal. That's one of my issues, too, that a complete record wasn't available for the non-trial lawyer doing the appeal. Counsel's case just started is ordered submitted and will take a ten minute recess before hearing the last case on today's calendar.
judges: Thompson, Trott, Tallman